Gao v. Sinova Specialties, Inc., 2018 NCBC 72.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY<br><br>JIANXUN "BILL" GAO, individually, and derivatively on behalf of Sinova Specialties, Inc.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>SINOVA SPECIALTIES, INC., a North Carolina Corporation; JOHANNES HECKMANN; YAN "ELLEN" LIU; NEW SHORE, INC., a North Carolina Corporation,<br><br>　　　　　Defendants,<br><br>SINOVA SPECIALTIES, INC., a North Carolina Corporation,<br><br>　　　　　Nominal Defendant. | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>16 CVS 6709<br><br><br><br><br><br>**ORDER AND OPINION ON PLAINTIFF'S MOTIONS TO DISMISS PURSUANT TO RULE 12(b)(6)** |

1.　**THIS MATTER** is before the Court on Plaintiff's motions to dismiss the counterclaims of Defendant/Nominal-Defendant Sinova Specialties, Inc. ("Sinova US"), Defendant Johannes Heckmann ("Heckmann"), and Defendant Yan "Ellen" Liu ("Liu") (collectively, the "Counterclaimants") pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). Having considered the motions, the briefs, and the arguments of counsel at a hearing on the motions[1], the Court **GRANTS in part** and **DENIES in part** the motions.

---

[1] At the hearing, the Court also heard arguments of counsel on Plaintiff's motions to dismiss pursuant to Rule 12(b)(1) and Plaintiff's motion for summary judgment. The Court has issued a separate order and opinion on Plaintiff's Rule 12(b)(1) motions,

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jeffrey E. Oleynik, Jessica Thaller-Moran, and Ryan C. Fairchild, and Greenberg Traurig, LLP, by Gabriel Aizenberg, Andrew J. Enschedé, and Lucia Marker-Moore, for Plaintiff.*

*Erwin, Bishop, Capitano & Moss, P.A., by Joseph W. Moss, Jr., for Defendant/Nominal-Defendant Sinova Specialties, Inc.*

*Essex Richards, PA, by Marc E. Gustafson, for Defendants Johannes Heckmann and New Shore, Inc.*

*Higgins & Owens, PLLC, by Sara W. Higgins, for Defendant Yan "Ellen" Liu.*

Robinson, Judge.

## I. FACTUAL BACKGROUND

2. The Court does not make findings of fact on the motions; rather, the Court recites the following factual allegations of the counterclaims that are relevant and necessary to the Court's determination of the motions.

### A. The Parties and Related Entities

3. Sinova US, a North Carolina corporation, was formed in 2009. (Heckmann's Am. Countercls. ¶¶ 3, 8, ECF No. 267; Liu's Am. Countercls. ¶¶ 3, 8, ECF No. 268; Sinova US's Second Am. Countercls. ¶¶ 1, 8, ECF No. 266.) Sinova US develops and sells chemical compounds. (Heckmann's Am. Countercls. ¶¶ 9−11; Liu's Am. Countercls. ¶¶ 9−11; Sinova US's Second Am. Countercls. ¶¶ 9−11.)

4. Plaintiff Jianxun "Bill" Gao ("Gao"), Heckmann, and Liu are the sole shareholders, directors, and officers of Sinova US. (*See* Heckmann's Am. Countercls.

(ECF No. 332), and the Court will issue a separate order and opinion on Plaintiff's motion for summary judgment.

¶ 85; Liu's Am. Countercls. ¶ 85; Sinova US's Second Am. Countercls. ¶ 86; Verified Am. Compl. Ex. C, ECF No. 56.)

5.    In 2011, Feng Sujin, Zhang Lanjun, and Wang Shufen, Gao's mother-in-law, formed Sinova Chemicals Limited ("Sinova HK"), a Hong Kong corporation. (Heckmann's Am. Countercls. ¶ 3; Heckmann's Am. Answer, Affirmative Defenses & Countercls. ¶ 14, ECF No. 221 ["Heckmann's Answer"]; Liu's Am. Countercls. ¶ 3; Liu's Am. Answer, Affirmative Defenses & Countercls. ¶ 14, ECF No. 215 ["Liu's Answer"]; Sinova US's Second Am. Countercls. ¶ 3; Sinova US's Answer to Am. Compl. ¶ 14, ECF No. 195 ["Sinova US's Answer"].)

6.    In 2012, Gao, Liu, and Feng Sujin formed Sinova Specialties, Inc. (Beijing) ("Sinova Beijing"), a Chinese corporation.  (Heckmann's Am. Countercls. ¶ 3; Heckmann's Answer ¶ 15; Liu's Am. Countercls. ¶ 3; Liu's Answer ¶ 15; Sinova US's Second Am. Countercls. ¶ 3; Sinova US's Answer ¶ 15.)

7.    Sinova US, Sinova Beijing, and Sinova HK are collectively referred to herein as the "Sinova Companies."

8.    Xin Yong Zhong Da Chemicals ("XYZD") is a Chinese corporation indirectly controlled by Heckmann, Liu, and Gao through Liu's mother, Gao's mother-in-law, and a third party.  (Heckmann's Am. Countercls. ¶ 4; Liu's Am. Countercls. ¶ 4; Sinova US's Second Am. Countercls. ¶ 4.)  In 2012, XYZD exported chemical compounds on behalf of Sinova US before Sinova Beijing was formed.  (Heckmann's Am. Countercls. ¶ 4; Liu's Am. Countercls. ¶ 4; Sinova US's Second Am. Countercls. ¶ 4.)

9. The Sinova Companies and XYZD are collectively referred to herein as the "Sinova Group."

B. **Business Operations**

10. The responsibilities of Sinova US were shared by Heckmann, Liu, and Gao. (Heckmann's Am. Countercls. ¶ 7; Liu's Am. Countercls. ¶ 7; Sinova US's Second Am. Countercls. ¶ 7.) Heckmann was primarily responsible for sales, Liu was primarily responsible for operations, and Gao was primarily responsible for the chemistry and technical aspects of the business. (Heckmann's Am. Countercls. ¶ 7; Liu's Am. Countercls. ¶ 7; Sinova US's Second Am. Countercls. ¶ 7.)

11. From 2009 to 2012, Sinova US's operations consisted of assisting Sinomax Solutions Inc. ("SMBJ"), a separate Chinese company in which neither Heckmann, Liu, nor Gao owned an interest, with its sales of the chemical compounds "PP," "BFA," and "TSS" in the United States and Europe. (Heckmann's Am. Countercls. ¶ 9; Liu's Am. Countercls. ¶ 9; Sinova US's Second Am. Countercls. ¶ 9.) In 2012, the Sinova Companies purchased SMBJ's business, including SMBJ's customer lists and the licensing rights to PP, BFA, and TSS, and Sinova US began selling chemical compounds in the United States and Europe on behalf of the Sinova Companies. (Heckmann's Am. Countercls. ¶ 10; Liu's Am. Countercls. ¶ 10; Sinova US's Second Am. Countercls. ¶ 10.) As a result, the Sinova Companies needed their own lab in order to do research and development, testing, and quality control for their products. (Heckmann's Am. Countercls. ¶ 11; Liu's Am. Countercls. ¶ 11; Sinova US's Second Am. Countercls. ¶ 11.)

12. From May 2012 through early 2014, Gao operated a lab in Beijing that was to be used for the benefit of the Sinova Group and for the purpose of creating products for sale by the Sinova Companies. (Heckmann's Am. Countercls. ¶ 12; Liu's Am. Countercls. ¶ 12; Sinova US's Second Am. Countercls. ¶ 12.) The Sinova Group paid all the costs of the lab, which included the cost of an office lease, equipment, supplies, reagents, testing, and salaries of approximately eleven employees. (Heckmann's Am. Countercls. ¶ 13; Liu's Am. Countercls. ¶ 13; Sinova US's Second Am. Countercls. ¶ 13.)

## C. CDA and 2012 Board Agreement

13. On or about September 16, 2012, the Sinova Group, Heckmann, Liu, and Gao entered into a "CDA and Non-Compete Agreement" (the "CDA").[2] (Heckmann's Am. Countercls. ¶ 79; Liu's Am. Countercls. ¶ 79; Sinova US's Second Am. Countercls. ¶ 80; Am. Compl. Ex. A.) The CDA provides that "[t]he three persons in this agreement" are Heckmann, Liu, and Gao, and that "[t]he company in this agreement is Sinova Specialties Inc. (Beijing) and its related company [sic] in USA, HK and China." (Am. Compl. Ex. A, at 1.) The CDA imposes an obligation on each of the individual parties to the agreement to "keep the secrecy of the company" and to "not leak the market, technology and operation secrecy to any third party directly or indirectly at any time." (Am. Compl. Ex. A, at 2.) The CDA further provides that "[a]nyone who breaches the [CDA] shall pay RMB 5million to the company. At the

---

[2] Most of the agreements and other documents involved in this case were originally written in Chinese and then translated into English, often with grammar and sentence structures that are difficult to understand.

same time, he/she shall compensate all the lost [sic] that caused [sic] to the company by his/her violating the [CDA]." (Am. Compl. Ex. A, at 3−4.) The CDA is signed by Sinova Beijing, Heckmann, Liu, and Gao. (Am. Compl. Ex. A, at 4.)

14. Also on or about September 16, 2012, Heckmann, Liu, and Gao entered into a board agreement (the "2012 Board Agreement"). (Heckmann's Am. Countercls. ¶ 84; Liu's Am. Countercls. ¶ 84; Sinova US's Second Am. Countercls. ¶ 85; Am. Compl. Ex. B.) The 2012 Board Agreement states that the shareholders of Sinova US and Sinova Beijing "are allowed to set up non-related other companies but are not allowed to do business compete [sic] with [Sinova US or Sinova Beijing]. The other companies are not allowed to provide or accept the product or service of [Sinova US or Sinova Beijing]." (Am. Compl. Ex. B, at 1.)

**D.    2014 Board Agreement**

15. In the middle of 2013, Heckmann, Liu, and Gao were negotiating the separation of their business interests. (Heckmann's Am. Countercls. ¶ 26; Liu's Am. Countercls. ¶ 26; Sinova US's Second Am. Countercls. ¶ 26.) The parties extensively negotiated which chemical products would continue to be manufactured and sold by the Sinova Group (the "Common Projects"). (Heckmann's Am. Countercls. ¶ 27; Liu's Am. Countercls. ¶ 27; Sinova US's Second Am. Countercls. ¶ 27.) Over the course of its business, the Sinova Group had attempted to develop many products that never came to fruition. (Heckmann's Am. Countercls. ¶ 30; Liu's Am. Countercls. ¶ 30; Sinova US's Second Am. Countercls. ¶ 30.) As a result, Heckmann, Liu, and Gao agreed that the Common Projects would include the Sinova Group's marketable and

profitable chemical compounds and those chemical compounds that were still under development with a potential upside as of January 2014. (Heckmann's Am. Countercls. ¶¶ 28–29; Liu's Am. Countercls. ¶¶ 28–29; Sinova US's Second Am. Countercls. ¶¶ 28–29.)

16. To determine which projects should be designated as Common Projects, Heckmann and Liu asked Gao to identify all the projects that had been run or developed in the lab. (Heckmann's Am. Countercls. ¶ 33; Liu's Am. Countercls. ¶ 33; Sinova US's Second Am. Countercls. ¶ 33.) Counterclaimants allege that, over several months beginning in mid-2013 through early 2014, Heckmann, Liu, and Gao discussed what Heckmann and Liu were led by Gao to believe were all of the projects being worked on in the lab. (Heckmann's Am. Countercls. ¶ 32; Liu's Am. Countercls. ¶ 32; Sinova US's Second Am. Countercls. ¶ 32.)

17. On July 11, 2013, Heckmann sent an e-mail to Gao and Liu stating: "It has come to my attention that the lab is running projects unknown to me. And these projects were not listed when I asked about lab projects. In order to come clean I ask to receive what projects the lab is running, for what customers, pricing and status." (Heckmann's Am. Countercls. ¶ 34; Liu's Am. Countercls. ¶ 34; Sinova US's Second Am. Countercls. ¶ 34.) Gao responded that "it is the project that we do for them and they do C12 Chemistry for 35 DCMC." (Heckmann's Am. Countercls. ¶ 35; Liu's Am. Countercls. ¶ 35; Sinova US's Second Am. Countercls. ¶ 35.)

18. In October 2013, Liu sent a directive to all lab employees, including Gao, stating that all data and records belong to the company, all lab data must be recorded

in a lab record book, the lab cannot be used to develop private projects, and the company would impose liability for the destruction or theft of lab data. (Heckmann's Am. Countercls. ¶ 36; Liu's Am. Countercls. ¶ 36; Sinova US's Second Am. Countercls. ¶ 36.)

19. In late December 2013, Liu received text messages from a Sinova Beijing employee, Wang Zongchao ("Zongchao") stating that lab employees were working on a chemical compound referred to as "ANT," that a 50 gram sample of ANT was sent overseas, and that Gao directed Sinova Beijing's employees who worked in the lab not to create records or reports regarding ANT and to otherwise conceal this information from Sinova US, Heckmann, and Liu. (Heckmann's Am. Countercls. ¶ 40; Liu's Am. Countercls. ¶ 40; Sinova US's Second Am. Countercls. ¶ 40.) Zongchao's text messages to Liu further stated that Gao directed Sinova Beijing employees to falsify payroll records to conceal the nature and extent of their work, "and that 'it seems there is a chance to commercialize [ANT].'" (Heckmann's Am. Countercls. ¶ 41; Liu's Am. Countercls. ¶ 41; Sinova US's Second Am. Countercls. ¶ 41 (alteration in original).)

20. On January 2, 2014, Liu sent a supplementary directive to all lab employees, including Gao, requesting that they report to Liu on what they were doing and that they come to the Sinova Beijing office once per week for a face-to-face meeting. (Heckmann's Am. Countercls. ¶ 42; Liu's Am. Countercls. ¶ 42; Sinova US's Second Am. Countercls. ¶ 42.) The next day, Gao rejected Liu's demand for

information and face-to-face meetings. (Heckmann's Am. Countercls. ¶ 42; Liu's Am. Countercls. ¶ 42; Sinova US's Second Am. Countercls. ¶ 42.)

21. In the two to three weeks following Zongchao's text messages, Gao never disclosed that ANT had been developed in the lab or that it was a commercially viable project, and Gao refused to allow lab employees to respond to Liu. (Heckmann's Am. Countercls. ¶ 43; Liu's Am. Countercls. ¶ 43; Sinova US's Second Am. Countercls. ¶ 43.) As a result, Counterclaimants allege that Heckmann and Liu justifiably assumed that ANT was not commercially viable in any respect. (Heckmann's Am. Countercls. ¶ 44; Liu's Am. Countercls. ¶ 44; Sinova US's Second Am. Countercls. ¶ 44.)

22. On or about January 15, 2014, Heckmann, Liu, and Gao entered into a board agreement (the "2014 Board Agreement"). (Am. Compl. Ex. C.) The 2014 Board Agreement identifies seven Common Projects, including RC2, PP, and BFA. (Am. Compl. Ex. C, ¶ 7.) ANT is not listed as a Common Project. The 2014 Board Agreement states that the participants, who are identified as Heckmann, Liu, and Gao, agree to "[k]eep minimum necessary budget for operation [sic] the common projects in [Sinova Beijing]" and to "[k]eep funding available for common projects at $3.5 million." (Am. Compl. Ex. C, ¶¶ 3−4.) The 2014 Board Agreement provides that "[a]ll projects that are not common projects are to be done outside of any common office facilities and at their own risk." (Am. Compl. Ex. C, ¶ 3.)

23. The 2014 Board Agreement further provides that "[e]ach board member will adhere to professional rules of conduct toward each other and promises to promote

the common projects to the best of their abilities and not to cause adverse effects to another board member. Should such action occur damages may be sought." (Am. Compl. Ex. C, ¶ 11.) The 2014 Board Agreement expressly incorporates the prior confidentiality and non-compete obligations set forth in the CDA and the 2012 Board Agreement. (Am. Compl. Ex. C, ¶ 2.)

24. Counterclaimants allege that, unbeknownst to them, Gao used the lab to develop ANT and other chemical compounds for the benefit of himself and companies other than the Sinova Group. (Heckmann's Am. Countercls. ¶¶ 21–22; Liu's Am. Countercls. ¶¶ 21–22; Sinova US's Second Am. Countercls. ¶¶ 21–22.) Counterclaimants further allege that, during Heckmann, Liu, and Gao's negotiations, Gao concealed that he had developed ANT in the lab and that it was, or had the potential to be, commercially viable. (Heckmann's Am. Countercls. ¶¶ 37, 39; Liu's Am. Countercls. ¶¶ 37, 39; Sinova US's Second Am. Countercls. ¶¶ 37, 39.) Counterclaimants contend that, as a result, ANT was not included as a Common Project in the 2014 Board Agreement, and Counterclaimants entered into a materially different agreement than they otherwise would have if they had known about ANT and its potential commercial viability. (Heckmann's Am. Countercls. ¶¶ 45, 145; Liu's Am. Countercls. ¶¶ 45, 146; Sinova US's Second Am. Countercls. ¶¶ 45, 163.)

### E. Gao's Sales of ANT and Disclosure of Confidential Information

25. After Heckmann, Liu, and Gao executed the 2014 Board Agreement, Liu met Gao at the lab in January 2014 to audit all lab records. (Heckmann's Am.

Countercls. ¶ 47; Liu's Am. Countercls. ¶ 47; Sinova US's Second Am. Countercls. ¶ 47.) Counterclaimants allege that Gao failed to produce any records for ANT or any other private projects that he had worked on in the lab and that had existing marketability or potential future upside. (Heckmann's Am. Countercls. ¶ 48; Liu's Am. Countercls. ¶ 48; Sinova US's Second Am. Countercls. ¶ 48.)

26.    Counterclaimants allege that Gao owns or controls, directly or indirectly through his wife or others, a company known as Beijing PTG Advanced Catalyst Co., Ltd. ("PTG Beijing") and a second company known as PTG Advanced Catalyst Co., Limited – Hong Kong ("PTG Hong Kong"). (Heckmann's Am. Countercls. ¶ 52; Liu's Am. Countercls. ¶ 52; Sinova US's Second Am. Countercls. ¶ 52.) PTG Beijing and PTG Hong Kong are collectively referred to herein as the "PTG Entities."

27.    Counterclaimants allege that the PTG Entities obtained ANT from and through Gao while Gao was an officer and director of Sinova US. (Heckmann's Am. Countercls. ¶ 61; Liu's Am. Countercls. ¶ 61; Sinova US's Second Am. Countercls. ¶ 61.) Counterclaimants contend that, under Gao's direction and control, the PTG Entities engaged plants to manufacture ANT exclusively for the PTG Entities, which they then purchased and sold to their customers at a substantial profit from December 2013 through the present. (Heckmann's Am. Countercls. ¶¶ 52, 57, 62, 65−66, 74; Liu's Am. Countercls. ¶¶ 52, 57, 62, 65−66, 74; Sinova US's Second Am. Countercls. ¶¶ 52, 57, 62, 65−66, 75.) Counterclaimants allege that, in addition to ANT, Gao marketed and sold Common Projects through the PTG Entities.

(Heckmann's Am. Countercls. ¶¶ 91, 94; Liu's Am. Countercls. ¶¶ 91, 94; Sinova US's Second Am. Countercls. ¶¶ 92, 95.)

28.    Counterclaimants further allege that Gao improperly disclosed confidential information of Sinova US and its customers.  Sinova US has agreements with its customers to keep information regarding the chemical compounds that Sinova US sells to those customers confidential.  (Heckmann's Am. Countercls. ¶ 96; Liu's Am. Countercls. ¶ 96; Sinova US's Second Am. Countercls. ¶ 97.)  Sinova US's agreement with one such customer, Shell Chemical LP ("Shell"), prohibited Sinova US and its representatives from disclosing Shell's confidential information, which included all products—specifically, RC2—that Sinova US might manufacture for Shell and all information related thereto.  (Heckmann's Am. Countercls. ¶¶ 97–98, 101; Liu's Am. Countercls. ¶¶ 97–98, 101; Sinova US's Second Am. Countercls. ¶¶ 98–99, 102.)  The Shell agreement also prohibited Sinova US from including Shell's confidential information in any patent application.  (Heckmann's Am. Countercls. ¶ 99; Liu's Am. Countercls. ¶ 99; Sinova US's Second Am. Countercls. ¶ 100.)

29.    In March 2015, Gao caused PTG Beijing to apply for a patent for RC2.  (Heckmann's Am. Countercls. ¶ 102; Liu's Am. Countercls. ¶ 102; Sinova US's Second Am. Countercls. ¶ 103.)  Counterclaimants allege that the RC2 patent application disclosed Shell's confidential information, as well as confidential and proprietary processes that were developed by the Sinova Group in the lab.  (Heckmann's Am. Countercls. ¶¶ 103, 105; Liu's Am. Countercls. ¶¶ 103, 105; Sinova US's Second Am. Countercls. ¶¶ 104, 106.)    Counterclaimants further allege that Gao disclosed

detailed information about the chemical compounds that belonged to Shell and Chevron Phillips, another customer of Sinova US, which Sinova US was obligated to keep confidential. (Heckmann's Am. Countercls. ¶¶ 107, 111−12, 116−17, 119−20; Liu's Am. Countercls. ¶¶ 107, 111−12, 116−17, 119−20; Sinova US's Second Am. Countercls. ¶¶ 108, 112−13, 117−18, 120−21.)

## II.    PROCEDURAL HISTORY

30.    The Court recites only those portions of the procedural history that are relevant to its determination of the motions.

31.    Gao filed his complaint on April 8, 2016 and an amended complaint on July 8, 2016. The amended complaint asserts direct claims for judicial dissolution of Sinova US, inspection of Sinova US's corporate records, breach of fiduciary duty, constructive fraud, and unjust enrichment.[3] (Am. Compl. 37, 40, 43, 45, 47.) The amended complaint asserts derivative claims on behalf of Sinova US for breach of fiduciary duty, constructive fraud, corporate waste, unjust enrichment, and breach of contract. (Am. Compl. 41, 44, 46−48.)

32.    This action was designated as a mandatory complex business case by order of the Honorable Mark Martin, Chief Justice of the Supreme Court of North Carolina, dated April 11, 2016, (ECF No. 4), and assigned to the Honorable Louis A. Bledsoe, III by order of then Chief Business Court Judge James L. Gale dated April 14, 2016,

---

[3] The amended complaint also asserted a direct claim for corporate waste, which the Court dismissed with prejudice by order and opinion dated December 21, 2016. (ECF No. 188.)

(ECF No. 5).  This case was later reassigned to the undersigned by order dated July 5, 2016.  (ECF No. 54.)

33.     All Defendants answered the amended complaint, and Sinova US, Heckmann, and Liu asserted counterclaims against Gao.  (ECF Nos. 97, 195, 215, 221.)

34.     On June 30, 2017, Sinova US filed its second amended counterclaims, and Heckmann and Liu each filed first amended counterclaims.  Sinova US, Heckmann, and Liu each assert counterclaims against Gao for fraud and breach of contract—Sinova US alleges that Gao breached the CDA, the 2012 Board Agreement, and the 2014 Board Agreement, and Heckmann and Liu allege that Gao breached the 2012 Board Agreement and the 2014 Board Agreement.[4]  (Heckmann's Am. Countercls. 18, 20; Liu's Am. Countercls. 18, 20; Sinova US's Second Am. Countercls. 24, 26.)  Sinova US asserts additional counterclaims against Gao for breach of fiduciary duty, constructive fraud, unfair and deceptive trade practices ("UDTP"), and unjust enrichment.  (Sinova US's Second Am. Countercls. 22–23, 29–30.)

35.     On July 28, 2017, Gao filed his motions to dismiss all counterclaims against him pursuant to Rule 12(b)(6).  (ECF Nos. 272–73.)

36.     The motions have been fully briefed, and the Court held a hearing on the motions on December 6, 2017.  The motions are now ripe for resolution.

---

[4] Heckmann and Liu also allege that Gao breached the CDA.  By order and opinion dated July 16, 2018, the Court dismissed Heckmann's and Liu's breach of contract counterclaims to the extent these claims were based on the CDA.  (ECF No. 332.)

### III.    LEGAL STANDARD

37.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the counterclaims in the light most favorable to the counterclaimant. The Court's inquiry is "whether, as a matter of law, the allegations of the [counterclaims], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the counterclaims liberally and accepts all factual allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

38.    Where the pleading refers to and depends on certain documents, the Court may consider those documents without converting the motion into one for summary judgment under Rule 56. *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009). At the same time, the Court may not consider materials that are not mentioned, contained, or attached in or to the pleading; otherwise, a Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890−91 (1979).

39.    Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the [pleading] on its face reveals that no law supports [the] claim; (2) when the [pleading] reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the [pleading] necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*,

318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, the counterclaims "should not be dismissed for insufficiency unless it appears to a certainty that [counterclaimant] is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970).

## IV. ANALYSIS

### A. Gao's Motion to Dismiss Heckmann's and Liu's Counterclaims

#### 1. Breach of Contract

40. Gao argues that Heckmann and Liu fail to sufficiently allege that Gao breached the 2012 or 2014 Board Agreement. (Pl.'s Mem. Supp. Mot. Dismiss Am. Countercls. of Liu & Heckmann Pursuant to Rule 12(b)(6), at 9–15, ECF No. 274 ["Pl.'s Mem. Supp. Heckmann & Liu Mot."].)

41. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 795 S.E.2d 641, 645 (N.C. Ct. App. 2017). When a contract is plain and unambiguous, the Court can determine the parties' intent as a matter of law. *42 E., LLC v. D.R. Horton, Inc.*, 218 N.C. App. 503, 513, 722 S.E.2d 1, 8 (2012). If a contract is ambiguous, however, interpretation of the contract is a question of fact for the jury. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748

(2012). An ambiguity exists when the effect of provisions is uncertain or capable of several reasonable interpretations. *Id.*

42. Paragraph 1 of the 2012 Board Agreement provides:

> The share holders [sic] of Sinova Specialties Inc. (Beijing and USA, will be called as Company in below [sic]) are allowed to set up non-related other companies but are not allowed to do business compete [sic] with the Company. The other companies are not allowed to provide or accept the product or service of the Company. It is not allowed to separate the existing business of the Company in any method.

(Am. Compl. Ex. B, ¶ 1.) Gao argues that this provision prohibits non-related companies, rather than Heckmann, Liu, and Gao, from doing business to compete with Sinova US or Sinova Beijing. (Pl.'s Reply Supp. Mot. Dismiss Am. Countercls. of Liu & Heckmann Pursuant to Rule 12(b)(6), at 7, ECF No. 294.) Accordingly, Gao argues that, because he is not a non-related company, he did not breach the 2012 Board Agreement by allegedly competing with Sinova US and Sinova Beijing.

43. The Court concludes that the 2012 Board Agreement—specifically, the first sentence of paragraph 1—can reasonably be interpreted as prohibiting the shareholders, rather than other non-related companies, from doing business to compete with Sinova US or Sinova Beijing. Heckmann and Liu allege that Gao breached the 2012 Board Agreement by using the Sinova Group's lab, resources, technology, and employees to develop ANT for his own benefit and for the benefit of companies controlled by Gao, which then sold ANT for a substantial profit. (Heckmann's Am. Countercls. ¶¶ 21–22, 24, 74; Liu's Am. Countercls. ¶¶ 21–22, 24, 74.) Heckmann and Liu allege that these sales should have been made by Sinova US. (Heckmann's Am. Countercls. ¶ 45; Liu's Am. Countercls. ¶ 45.) The Court concludes

that these allegations are sufficient to state that Gao did business in competition with Sinova US and Sinova Beijing in breach of the 2012 Board Agreement.

44. The Court likewise concludes that Heckmann and Liu sufficiently allege that Gao breached the 2014 Board Agreement. The 2014 Board Agreement expressly incorporates the confidentiality provision of the CDA, which obligates Heckmann, Liu, and Gao to "keep the secrecy of the company" and to "not leak the market, technology and operation secrecy to any third party directly or indirectly at any time." (Am. Compl. Ex. A, ¶ 3; Am. Compl. Ex. C, ¶ 2.) Heckmann and Liu allege that, in March 2015, Gao caused PTG Beijing to apply for a patent for RC2, and that the patent application disclosed the Sinova Group's confidential and proprietary processes that had been developed in the lab. (Heckmann's Am. Countercls. ¶¶ 102, 105; Liu's Am. Countercls. ¶¶ 102, 105.) These allegations are sufficient to state that Gao disclosed the Sinova Group's confidential and proprietary processes to PTG Beijing and thereby leaked "market, technology, and operation secrecy" to a third party in breach of the 2014 Board Agreement.

45. Having concluded that the allegations are sufficient to state a claim that Gao breached the 2012 and 2014 Board Agreements, the Court declines to address Gao's arguments as to the sufficiency of each alleged breach of these agreements. The Court believes this is consistent with the purpose of a motion to dismiss under Rule 12(b)(6) and our notice pleading standard. *See Corwin v. British Am. Tobacco PLC*, 796 S.E.2d 324, 333 (N.C. Ct. App. 2016) ("The purpose behind this pleading standard, generally referred to as notice pleading, is to resolve controversies on the

merits, after an opportunity for discovery, instead of resolving them based on the technicalities of pleadings." (quotation marks omitted)); *Brittian v. Brittian*, 243 N.C. App. 6, 10, 776 S.E.2d 867, 871 (2015) ("Our Supreme Court has long recognized that '[t]he only purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the pleading against which it is directed.'" (alteration in original) (quoting *White v. White*, 296 N.C. 661, 667, 252 S.E.2d 698, 702 (1979))).

46. Therefore, Gao's motion to dismiss Heckmann's and Liu's breach of contract counterclaims is denied.

### 2. Fraud

47. Heckmann and Liu allege that, in the course of negotiating the separation of their business interests, Gao fraudulently concealed from Heckmann and Liu that ANT was a marketable project with potential upside that had been developed in the lab. (Heckmann's Am. Countercls. ¶ 142; Liu's Am. Countercls. ¶ 143.) Heckmann and Liu further allege that, as a result of Gao's fraud, Heckmann and Liu entered into a materially different 2014 Board Agreement than they otherwise would have if they had known of ANT's commercial viability and that it had been developed in the lab. (Heckmann's Am. Countercls. ¶ 145; Liu's Am. Countercls. ¶ 146.)

48. To state a claim for fraud, Heckmann and Liu "must plead five elements: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Head v. Gould Killian CPA Grp., P.A.*, 812 S.E.2d 831, 837 (N.C. 2018) (quotation marks omitted). "Additionally, reliance on alleged

false representations must be reasonable." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (2003).

49. Gao argues that Heckmann's and Liu's fraud claims fail because they cannot establish reasonable reliance. (Pl.'s Mem. Supp. Heckmann & Liu Mot. 17.) In support, Gao substantially relies on a document attached to his brief in support of his motion to dismiss that contains photographs of text messages between Liu and Zongchao in Chinese and the English translations thereof. (Pl.'s Mem. Supp. Heckmann & Liu Mot. Ex. 1, ECF No. 272.2.) Gao argues that the Court can consider this document in ruling on his motion to dismiss because Heckmann and Liu explicitly rely on and refer to the text messages in their counterclaims. (Pl.'s Mem. Supp. Heckmann & Liu Mot. 4 n.4.)

50. "On a motion to dismiss under Rule 12(b)(6), if 'matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.'" *Pinney v. State Farm Mut. Ins. Co.*, 146 N.C. App. 248, 251, 552 S.E.2d 186, 189 (2001) (quoting N.C. Gen. Stat. § 1A-1, Rule 12(b)). However, "a document that is the subject of a [claimant]'s action that he or she specifically refers to in the [pleading] may be attached as an exhibit by the [movant] and properly considered by the trial court without converting a Rule 12(b)(6) motion into one of summary judgment." *Holton v. Holton*, __ N.C. App. __, No. COA17-467, 2018 N.C. App. LEXIS 297, at *19 (N.C. Ct. App. Mar. 20, 2018); *see also Bucci v. Burns*, 2018 NCBC LEXIS 37, at *8 (N.C. Super. Ct. Apr. 25,

2018) (noting that a classic example of such a document "is the contract at the heart of a claim for breach of contract").

> This is due to the fact that [t]he obvious purpose of . . . Rule 12(b) is to preclude any unfairness resulting from surprise when an adversary introduces extraneous material on a Rule 12(b)(6) motion, and to allow a party a reasonable time in which to produce materials to rebut an opponent's evidence once the motion is expanded to include matters beyond those contained in the pleadings.
>
> . . . .
>
> . . . Certainly the [claimants] cannot complain of surprise when the trial court desires to familiarize itself with the instrument upon which the [claimants] are suing because the [claimants] have failed to reproduce or incorporate by reference the particular instrument in its entirety in the [pleading].

*Bank of Am., N.A. v. Rice*, 244 N.C. App. 358, 370−71, 780 S.E.2d 873, 882 (2015) (first alteration and omission in original) (quotation marks omitted).

51. The Court concludes that the document may not be considered in ruling on Gao's Rule 12(b)(6) motion. Although Counterclaimants refer to December 2013 text messages between Liu and Zongchao, the text messages are not the subject of the counterclaims. *See Holton*, 2018 N.C. App. LEXIS 297, at *20 ("[W]here a [claimant] simply refers to a document that was not the subject of his or her action, and the [movant] attaches that document or an affidavit concerning that document to support a Rule 12(b)(6) . . . motion, the trial court's consideration of that document converts the motion into one for summary judgment."). Thus, the Court does not consider the document in ruling on Gao's motion to dismiss.

52. Gao argues that Counterclaimants cannot establish reasonable reliance because they were aware of the facts that they allege Gao concealed and the acts of

concealment, and they fail to allege that they were denied the opportunity to investigate.

53. Our appellate courts have stated that "reasonable" reliance "is most succinctly defined in the negative: Reliance is not reasonable where the [claimant] could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 90, 747 S.E.2d 220, 227 (2013) (quotation marks omitted); *see also Everts v. Parkinson*, 147 N.C. App. 315, 326–27, 555 S.E.2d 667, 675 (2001) (citing and discussing *Rosenthal v. Perkins*, 42 N.C. App. 449, 257 S.E.2d 63 (1979)); *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) ("[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the [pleading] must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence."). "When it appears 'a [claimant] seeking relief from alleged [fraud] must have known the truth, the doctrine of reasonable reliance will prevent him from recovering for a misrepresentation which, if in point of fact made, did not deceive him.'" *Collier v. Bryant*, 216 N.C. App. 419, 435, 719 S.E.2d 70, 83 (2011) (second alteration in original) (quoting *Johnson v. Owens*, 263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965)). The reasonableness of a party's reliance is a question for the jury "unless the facts are so clear that they support only one conclusion." *Head*, 812 S.E.2d at 837.

54. The Court concludes that Liu fails to allege sufficient facts to state that she reasonably relied on Gao's concealment or misrepresentation. The counterclaims

allege that, in December 2013—after Heckmann and Liu had asked Gao to identify all projects that had been developed in the lab—Zongchao informed Liu that lab employees were working on ANT, that Gao directed lab employees not to create records or reports regarding ANT and to conceal this information from Counterclaimants, and that it seemed there was a chance to commercialize ANT. (Liu's Am. Countercls. ¶¶ 40–41.) Thus, the counterclaims allege that Liu was informed, prior to execution of the 2014 Board Agreement, that ANT was being developed in the lab and that it had potential commercial value and, therefore, that Gao should have disclosed ANT as a Common Project. Further, the allegations of the counterclaims disclose that Liu was aware prior to executing the 2014 Board Agreement that Gao had directed lab employees to conceal ANT from Counterclaimants.

55. Liu alleges that, prior to executing the 2014 Board Agreement, she was aware that ANT had been developed in the lab, Gao directed lab employees to conceal ANT from her, and there was a chance to commercialize ANT. Therefore, the Court concludes that Liu fails to allege that she reasonably relied on Gao's concealment of ANT or his misrepresentation regarding all the projects that had been developed in the lab and those with potential commercial value. As a result, Gao's motion to dismiss Liu's fraud counterclaim is granted, and this claim is dismissed with prejudice.

56. The counterclaims do not allege, however, that Heckmann—prior to executing the 2014 Board Agreement—had knowledge of the text messages that Liu

received from Zongchao or that Heckmann was otherwise aware of ANT or Gao's concealment thereof. The counterclaims allege that Gao exercised complete control and discretion over the operations of and access to the lab, including the lab employees. (Heckmann's Am. Countercls. ¶¶ 15, 18.) The counterclaims further allege that Heckmann asked Gao to identify all projects that had been run or developed in the lab, and Gao did not identify ANT. (Heckmann's Am. Countercls. ¶¶ 33, 37.) On July 11, 2013, Heckmann sent an e-mail to Gao stating that it had come to his attention that the lab was running projects unknown to him and which Gao did not previously identify, and again asked for all projects that the lab was running. (Heckmann's Am. Countercls. ¶ 34.) Gao responded and identified another project, but did not identify ANT. (Heckmann's Am. Countercls. ¶ 35.) Heckmann alleges that he had no opportunity to discover Gao's concealment of his use of the lab to develop ANT as a commercially viable project because Gao dominated and controlled the lab and its employees and directed that records relating to ANT not be maintained or provided to Heckmann. (Heckmann's Am. Countercls. ¶ 147.)

57. Therefore, the Court concludes that Heckmann alleges sufficient facts to plead reasonable reliance and, as a result, Gao's motion to dismiss Heckmann's fraud counterclaim is denied.

**B. Gao's Motion to Dismiss Sinova US's Counterclaims**

**1. Breach of Contract**

**a. CDA**

58. Gao argues that Sinova US fails to allege that Gao breached the CDA. (Pl.'s Mem. Supp. Heckmann & Liu Mot. 9–15.) As discussed above with respect to Gao's motion to dismiss Heckmann's and Liu's counterclaims for breach of the 2014 Board Agreement, the confidentiality provision of the CDA obligates Heckmann, Liu, and Gao to "keep the secrecy of the company" and to "not leak the market, technology and operation secrecy to any third party directly or indirectly at any time." (Am. Compl. Ex. A, ¶ 3.) Sinova US alleges that, in March 2015, Gao caused PTG Beijing to apply for a patent for RC2 and that the patent application disclosed the Sinova Group's confidential and proprietary processes that had been developed in the lab. (Sinova US's Second Am. Countercls. ¶¶ 103, 106.) These allegations are sufficient to state that Gao disclosed the Sinova Group's confidential and proprietary processes to PTG Beijing and thereby leaked "market, technology, and operation secrecy" to a third party in breach of the CDA. Therefore, Gao's motion to dismiss Sinova US's breach of contract counterclaim is denied to the extent this claim is based on the CDA.

**b. 2012 and 2014 Board Agreements**

59. Gao argues that Sinova US fails to allege claims for breach of the 2012 and 2014 Board Agreements because it is neither a party to, nor a third-party beneficiary of, these agreements. (Pl.'s Mem. Supp. Mot. Dismiss Second Am. Countercl. of

Sinova US Pursuant to Rule 12(b)(6), at 3–5, ECF No. 273.1 ["Pl.'s Mem. Supp. Sinova US Mot."].)

60. To maintain a claim for breach of contract, the claimant must allege that it is in privity of contract or a third-party beneficiary of the contract. *Woolard v. Davenport*, 166 N.C. App. 129, 136, 601 S.E.2d 319, 324 (2004). Unlike the CDA, which is on Sinova US letterhead, signed by Sinova Beijing, and states that Sinova US and Sinova Beijing are parties thereto, the 2012 and 2014 Board Agreements are not on Sinova US letterhead, are not signed by the Sinova Companies, and do not state that Sinova US or any other entity is a party to the agreements. The 2012 Board Agreement states that Sinova US's board members "are willing to sign and obey" the agreement. (Am. Compl. Ex. B, at 1.) Similarly, the 2014 Board Agreement states that the participants in the agreement are Heckmann, Liu, and Gao. Sinova US fails to allege any other facts to support the conclusion that it is a party to either the 2012 or 2014 Board Agreement.

61. To assert rights under a contract as a third-party beneficiary, a claimant must allege "(1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the [third party]." *Town of Belhaven v. Pantego Creek, LLC*, 793 S.E.2d 711, 719 (N.C. Ct. App. 2016) (alteration in original). "A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person." *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 703, 671 S.E.2d 7, 13 (2009). "It is not enough that the contract, in fact, benefits

the [third party], if, when the contract was made, the contracting parties did not intend it to benefit the [third party] directly." *Town of Belhaven*, 793 S.E.2d at 719 (alterations in original). "When a party seeks enforcement of a contract as a third-party beneficiary, the contract must be construed strictly against the party seeking enforcement." *Michael v. Huffman Oil Co.*, 190 N.C. App. 256, 269, 661 S.E.2d 1, 10 (2008).

62. The Court concludes that Sinova US fails to allege that the 2012 or 2014 Board Agreement were executed for Sinova US's direct benefit. The first paragraph of the 2012 Board Agreement states that it is "to protect the rights and interest of the parties in this agreement"—who are Heckmann, Liu, and Gao. (Am. Compl. Ex. B.) The first paragraph of the 2014 Board Agreement states that it is "to maintain the common companies' smoothly [sic] operation and [Heckmann, Liu, and Gao's] interests[.]" (Am. Compl. Ex. C.) Further, Sinova US's counterclaims contain only conclusory allegations that it is a third-party beneficiary of the 2012 and 2014 Board Agreements and that the 2014 Board Agreement was executed for its benefit. (Sinova US's Second Am. Countercls. ¶¶ 86, 147, 149.)

63. As Sinova US fails to allege sufficient facts to state that the 2012 or 2014 Board Agreement were executed for its direct benefit, Sinova US fails to state a claim for breach of these agreements. Accordingly, Gao's motion to dismiss Sinova US's breach of contract counterclaim is granted to the extent this claim is based on the 2012 and 2014 Board Agreements, and this claim is dismissed with prejudice.

### 2. Fraud

64. Gao argues that Sinova US's fraud claim must be dismissed because Sinova US is not a party to the 2014 Board Agreement and, as a result, could not have been fraudulently induced into entering this agreement. (Pl.'s Mem. Supp. Sinova US Mot. 5–6.) Sinova US argues that it is a party to the 2014 Board Agreement and thus has stated a claim for fraud. (Sinova US's Br. Opp'n Pl.'s Rule 12(b)(6) Mot. Dismiss 12, ECF No. 284.)

65. Having determined that Sinova US is not a party to the 2014 Board Agreement, the Court concludes that Sinova US fails to state a claim for fraud. Gao's motion to dismiss Sinova US's fraud counterclaim is granted, and this claim is dismissed with prejudice.

### 3. Unjust Enrichment

66. Gao argues that Sinova US's unjust enrichment claim must be dismissed because there is an express contract between the parties and Sinova US fails to allege that it volitionally conferred a benefit on Gao. (Pl.'s Mem. Supp. Sinova US Mot. 10–11.)

67. An unjust enrichment claim is a claim in quasi contract or a contract implied in law. *M Series Rebuild, LLC v. Town of Mount Pleasant*, 222 N.C. App. 59, 67, 730 S.E.2d 254, 260 (2012). "A quasi contract or a contract implied in law is not a contract. The claim is not based on a promise but is imposed by law to prevent an unjust enrichment. If there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570,

369 S.E.2d 554, 556 (1988). "Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998).

68. Notwithstanding that an express contract precludes an implied contract concerning the same matter, it is also well established under North Carolina law that a party may plead claims in the alternative. *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C. App. 414, 419, 634 S.E.2d 557, 560 (2006) (concluding that plaintiff may plead her express contract and quantum meruit claims in the alternative even though plaintiff may not ultimately be able to prevail on both). Here, Sinova US expressly pleaded its unjust enrichment claim in the alternative. (Sinova US's Second Am. Countercls. 30.) Thus, although Sinova US may not ultimately be able to prevail on both its breach of contract and unjust enrichment claims, at the pleading stage, the Court cannot conclude that the express agreement precludes Sinova US from recovering on its unjust enrichment claim.

69. To state a claim for unjust enrichment, a claimant must allege facts that show "that it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002).

70. Sinova US alleges that the Sinova Group paid for all lab expenses, including the lease, equipment, supplies, reagents, testing, and salaries of lab employees, with

the expectation that Gao's work in the lab would exclusively benefit the Sinova Group. (Sinova US's Second Am. Countercls. ¶¶ 13–14.) Sinova US alleges that Gao instead used the lab and its resources to develop products for his own benefit and, therefore, that Sinova US conferred a benefit on Gao. (Sinova US's Second Am. Countercls. ¶¶ 21–22, 76.) These allegations are sufficient to state that Sinova US conferred a benefit on Gao, and Gao's motion to dismiss Sinova US's unjust enrichment claim is denied.

### 4. Breach of Fiduciary Duty

71. To state a claim for breach of fiduciary duty, Sinova US must allege that Gao owed it a fiduciary duty, that Gao breached that duty, and that this breach proximately caused injury to Sinova US. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006).

72. Gao lodges a number of arguments against the sufficiency of Sinova US's allegations, all of which the Court finds unavailing. Gao, as a director of Sinova US, owed fiduciary duties to Sinova US. *Governor's Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 248, 567 S.E.2d 781, 786 (2002). Sinova US alleges that Gao breached his fiduciary duties by disclosing Sinova US's confidential information, using Sinova US's assets for his own benefit and the benefit of other companies, and selling ANT, PP, and RC2 through the PTG Entities, rather than through Sinova US, at a substantial profit. (Sinova US's Second Am. Countercls. ¶¶ 125, 127, 130.) These allegations are sufficient to state a claim for breach of fiduciary duty, and Gao's motion to dismiss this claim is denied.

### 5. Constructive Fraud

73. "To assert a cause of action for constructive fraud, the [claimant] must allege facts and circumstances (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of [claimant]." *Head*, 812 S.E.2d at 837 (quotation marks omitted). A constructive fraud claim requires the existence of a fiduciary duty. *Brissett v. First Mount Vernon Indus. Loan Ass'n*, 233 N.C. App. 241, 252, 756 S.E.2d 798, 806 (2014). The difference between a constructive fraud claim and a breach of fiduciary duty claim is that a claim for constructive fraud requires that defendant sought to benefit himself. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004).

74. The Court has concluded that Sinova US's allegations are sufficient to state a claim for breach of fiduciary duty. Sinova US alleges that Gao used Sinova US's assets to develop chemical products for his benefit and, thus, sufficiently alleges the additional element of a constructive fraud claim that Gao sought to benefit himself. (Sinova US's Second Am. Countercls. ¶¶ 125, 130.) Therefore, Gao's motion to dismiss Sinova US's constructive fraud counterclaim is denied.

### 6. UDTP

75. Gao argues that Sinova US's UDTP claim must be dismissed because the alleged unfair or deceptive conduct occurred solely within a single market participant and, therefore, was not "in or affecting commerce." (Pl.'s Mem. Supp. Sinova US Mot. 6–7.)

76.     In order to state a UDTP claim, Sinova US must allege (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to Sinova US. *Belcher v. Fleetwood Enters., Inc.*, 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). "'[C]ommerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). "Although this statutory definition of commerce is expansive, [section 75-1.1] is not intended to apply to all wrongs in a business setting." *Alexander v. Alexander*, 792 S.E.2d 901, 904 (N.C. Ct. App. 2016) (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593, 403 S.E.2d 483, 492 (1991)). "'Business activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493. As further explained by our Supreme Court, section 75-1.1 regulates "two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). Section 75-1.1 does not apply to the internal conduct of individuals within a single market participant. *Alexander*, 792 S.E.2d at 904. Rather, "the General Assembly intended [section 75-1.1] to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a single business is not covered by [section 75-1.1]." *White*, 364 N.C. at 53, 691 S.E.2d at 680.

77. The essence of Sinova US's allegations is that Gao wrongfully competed with Sinova US in breach of his fiduciary duty and the CDA by disclosing the confidential information of Sinova US and its customers to third parties, and by using the lab to develop chemical compounds for his own benefit and the benefit of the PTG Entities. Sinova US contends that ANT was a corporate opportunity wrongfully usurped by Gao and that Gao sold ANT, PP, and RC2 through the PTG Entities at a substantial profit and for personal gain to the detriment of Sinova US. Sinova US alleges that these sales should have been made by Sinova US.

78. Sinova US alleges that Gao's actions, individually and through the PTG Entities—specifically, the sales of ANT, PP, and RC2—were in or affecting commerce. (Sinova US's Second Am. Countercls. ¶ 173.) The alleged unfair and deceptive conduct, however, occurred solely within Sinova US. Sinova US does not allege any unfairness or deception in the marketplace—that is, in interactions between separate market participants. The unfairness and deception of Gao's alleged conduct lies in his relationship with Sinova US as an officer and director thereof.

79. For these reasons, the cases cited by Sinova US are distinguishable. In *Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308 (1999), defendant-employee was hired by plaintiff-employer to order and purchase computer parts for plaintiff at the lowest possible prices. During his employment and unknown to plaintiff, defendant created separate businesses. Defendant engaged in self-dealing by selling computer parts and services through his businesses to plaintiff at excessive cost. Plaintiff, trusting that the transactions were legitimate and that defendant had

secured competitive prices, regularly conducted business with defendant's companies without knowledge of defendant's interest therein. Thus, the unfair or deceptive conduct occurred in interactions between two market participants—defendant's businesses and plaintiff.

80. Similarly, in *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 714 S.E.2d 162 (2011), the president of Songwooyarn formed a separate corporation, Sox Eleven, as an intermediary for the purpose of selling Songwooyarn's products to wholesalers. Songwooyarn wired a monthly payment to Sox Eleven. Defendant, who was hired to manage Sox Eleven's daily affairs, was to take his salary out of this monthly payment, and the remainder was to be used for Sox Eleven's operating expenses. Defendant deceived Songwooyarn about the use of the funds Songwooyarn wired to Sox Eleven, and the Court of Appeals concluded that by misappropriating those funds, defendant interrupted the commercial relationship between Songwooyarn and Sox Eleven. Thus, as in *Sara Lee*, the unfair or deceptive conduct occurred in interactions between two market participants—Songwooyarn and Sox Eleven.

81. Here, Sinova US does not allege any unfairness or deception in the broader marketplace; rather, Gao's alleged conduct is unfair and deceptive only as to Sinova US. The fact that Gao allegedly disclosed confidential information and diverted corporate opportunities to entities controlled by him does not change the fundamental nature of the dispute from an internal corporate dispute to one in or affecting commerce. *See White*, 364 N.C. at 54, 691 S.E.2d at 680 ("Because

defendant . . . unfairly and deceptively interacted only with his partners, his conduct occurred completely within the . . . partnership and entirely outside the purview of [section 75-1.1].”); *Alexander*, 792 S.E.2d at 905−06 (concluding that defendant’s misappropriation of corporate funds through payments he caused the company to make to himself and his family and friends was not in or affecting commerce); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *4, *13−16 (N.C. Super. Ct. Mar. 27, 2018) (granting motion to dismiss where plaintiff-shareholder alleged that defendant, an officer and director, improperly transferred corporate funds and assets to a corporation formed by defendant). “[W]hen the unfair or deceptive conduct alleged only affects relationships within a single business or market participant, and not dealings with other market participants, that conduct is not ‘in or affecting’ commerce within the meaning of section 75-1.1, even if other market participants may be indirectly involved in the unfair or deceptive acts.” *Powell v. Dunn*, 2014 NCBC LEXIS 3, at *9 (N.C. Super. Ct. Jan. 28, 2014).

82. As the alleged unfair or deceptive conduct concerns only the internal operations of a single market participant, the Court concludes that Sinova US fails to state a claim for UDTP, and this counterclaim is dismissed with prejudice.

## V. CONCLUSION

83. For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Gao’s motions to dismiss as follows:

>      A.     The Court **DENIES** Gao’s motion to dismiss Heckmann’s and Liu’s breach of contract counterclaims.

B. The Court **GRANTS** Gao's motion to dismiss Liu's fraud counterclaim, and this claim is dismissed with prejudice.

C. The Court **DENIES** Gao's motion to dismiss Heckmann's fraud counterclaim.

D. The Court **DENIES** Gao's motion to dismiss Sinova US's breach of contract counterclaim to the extent this claim is based on the CDA.

E. The Court **GRANTS** Gao's motion to dismiss Sinova US's breach of contract counterclaim to the extent this claim is based on the 2012 Board Agreement and the 2014 Board Agreement, and this claim is dismissed with prejudice.

F. The Court **GRANTS** Gao's motion to dismiss Sinova US's fraud counterclaim, and this claim is dismissed with prejudice.

G. The Court **DENIES** Gao's motion to dismiss Sinova US's unjust enrichment counterclaim.

H. The Court **DENIES** Gao's motion to dismiss Sinova US's breach of fiduciary duty counterclaim.

I. The Court **DENIES** Gao's motion to dismiss Sinova US's constructive fraud counterclaim.

J. The Court **GRANTS** Gao's motion to dismiss Sinova US's UDTP counterclaim, and this claim is dismissed with prejudice.

**SO ORDERED**, this the 16th day of July, 2018.

/s/ Michael L. Robinson
_____

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases